**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  4:18-CR-058-SNLJ-NAB |
| | ) | |
| ALVIN NETTLES, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  Defendant Alvin Nettles is charged along with co-defendant Reno Hughes in a three count indictment.  Nettles is charged in count one with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and in count two with possessing a firearm in furtherance of the drug trafficking crime of distribution of marijuana in violation of 18 U.S.C. § 924(c).  Defendant Nettles filed a motion to suppress evidence and statements resulting from a search of his residence.  Defendant contends that there was no probable cause for police to detain him outside the residence and that the search of the house was not consensual.

On August 23, 2018, the undersigned held an evidentiary hearing at which Defendant appeared with counsel.  The United States presented the testimony of Florissant Police Department Detective Dustin Edwards.  Defendant did not present any evidence, but cross-examined Detective Edwards.  The Government also introduced a Consent to Search and Seize form as evidence. [Gov. Exh.1].  Based on the evidence and testimony presented, a review of the transcript of the hearing, the briefs of the parties, and having had an opportunity to evaluate the

credibility of the witness and observe his behavior, the undersigned makes the following findings of fact and conclusions of law.

## I.   FINDINGS OF FACT

On October 25, 2017, Detective Edwards and three other members of the Florissant Police Department's Anti-Crime Unit established surveillance on a residence located at 1 Little Lane, Florissant, Missouri. The unit had received anonymous complaints from other residents regarding heavy foot and vehicle traffic suggesting possible narcotic activity.  Detective Edwards confirmed that Defendant Alvin Nettles and his brother, Reno Hughes, had used the address in the past.  During surveillance, the unit observed what Detective Edwards believed to be a "hand to hand" transaction conducted by Nettles, suggesting Nettles had sold drugs to an individual in a car. Nettles was seen re-entering the residence, returning two to three minutes later with a toddler, and placing the child in the back of a pick-up truck parked in the driveway.  Detective Edwards and the other officers made contact with Nettles while he was standing next to the pick-up truck.

Detective Edwards informed Nettles of their investigation, advised him of his rights, and began to ask questions about his knowledge of narcotic activity at the residence.  At this time, Nettles was not under arrest, he was not told he had to speak with law enforcement, and he was not threatened.  Nettles indicated he understood his rights, did not request a lawyer, and voluntarily chose to speak with officers.  During this conversation, Nettles made a statement about "smoking marijuana," but denied having knowledge of any transactions "coming and going" from the house.  Nettles further stated that the "traffic" officers observed was a friend or brother of his that had left a cellphone and had "pulled back up" to the residence to retrieve it.

2

Detective Edwards then inquired about Nettles' brother, Reno Hughes, and asked to speak with him. Nettles replied, "Yeah," and directed officers to a side door of the residence.

Reno Hughes met Detective Edwards and the other officers at the door. Detective Edwards asked if they could step inside to talk and Hughes agreed. Detective Edwards noticed an odor of marijuana inside the residence. Detective Edwards described Nettles and Hughes as "cooperative" and "willing to answer questions." Detective Edwards asked Hughes to contact his mother to inform her of the police presence and their reasons for being there. An occupancy check confirmed her as head of the household. Detective Edwards did not ask for her consent to search the residence.

Detective Edwards asked both Nettles and Hughes for consent to search the house, their respective bedrooms, and their immediate living area for narcotics. Nettles made a statement along the lines of, "Go ahead, you're not going to find anything." Hughes gave Detective Edwards verbal consent while stating, "Can I get my infant child?" and he later gave written consent.

According to Detective Edwards, Hughes read over the consent form for "one to two minutes" and took it to the kitchen to fill it out with his signature. The Government introduced a Consent to Search and Seize form signed by Hughes [Exh. #1]. Detective Edwards did not believe Hughes or Nettles appeared to be intoxicated, despite the odor of marijuana. He believed they were capable of giving valid consent. The Consent to Search form was not presented to Nettles, however, because Detective Edwards did not believe he needed two consent forms for the same residence.

Detective Edwards began to search the first bedroom on the left of the hallway in the residence, identified as belonging to Hughes. At this time, Hughes was present and he was

3

allowed to remove his child from the bedroom.   Detective Edwards saw several bags of marijuana, about one to two ounces, and a firearm on the top of a dresser in that bedroom.  The marijuana's packaging was consistent with distribution.  Detective Edwards seized the gun at that time and the marijuana at a later time.

Detective Edwards then went to Nettles' bedroom while the other three officers remained in the living room with Nettles and Hughes.  Nettles informed Detective Edwards that his bedroom was "straight down the hallway," and "You'll see it."  Nettles did not object to a search of his bedroom at any time.

When he entered Nettles' bedroom, Detective Edwards saw marijuana and a firearm on a black TV stand. The amount of marijuana was similar to the amount found in Hughes' bedroom. Detective Edwards seized the marijuana and the firearm to be placed into evidence.

After the search, Nettles and Hughes were arrested.   Nettles and Hughes received *Miranda* warnings before the interview at the police station.  Hughes made statements about the seized firearms.  Hughes told Detective Edwards that he had purchased the firearms, for himself and Nettles, from Cabela's a few weeks prior to the surveillance.  Hughes stated that he purchased the firearm for Nettles because Nettles was a convicted felon.  Detective Edwards confirmed that Hughes was able to legally purchase a firearm.  When Detective Edwards spoke with Nettles about the firearm, Nettles initially denied ownership of the firearm found in his room.   Nettles then made a statement about "not being killed for his involvement with marijuana."

4

## II.    CONCLUSIONS OF LAW

### Officer's stop and detention of Defendant

The Fourth Amendment protects people against unreasonable government seizures.  U.S. Const. amend. IV ("[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated").   For Fourth Amendment purposes, a seizure occurs whenever an officer restrains an individual's liberty by physical force or a show of authority to which the individual submits.  *California v. Hodari D.*, 499 U.S. 621, 626 (1991).  There are essentially two types of seizures that implicate the Fourth Amendment: traditional arrests and investigatory stops.   The arrest of a person is "quintessentially a seizure" required by the Fourth Amendment to be reasonable.  *United States v. Watson,* 423 U.S. 411, 428 (1976) (Powell, J., concurring).  If made pursuant to a warrant issued by a detached and neutral judge, an arrest is deemed to be presumptively reasonable.  *See United States v. Leon*, 468 U.S. 897, 922 (1984) ("a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith;" as such "[s]earches [or seizures] pursuant to a warrant will rarely require any deep inquiry into reasonableness"). *See also Payton v. New York*, 445 U.S. 573, 602 (1980) (an arrest warrant "interpose[s] the magistrate's determination of probable cause between the zealous officer and the citizen").  An officer may conduct a warrantless arrest without violating the Fourth Amendment if the officer has probable cause to believe the arrestee has committed a felony and the arrest occurs in a public place. *See Watson*, 423 U.S. at 423-24.

In *Terry v. Ohio*, 392 U.S. 1, 28-31 (1968), the Supreme Court held that investigatory stops— *i.e.*, brief seizures by police that fall short of traditional arrests—are also reasonable and

5

lawful if justified by a reasonable suspicion that an individual is engaged in criminal activity and if police activities during the investigatory stop are reasonably related to the circumstances that initially justified the stop. *See also Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). "Reasonable suspicion requires that the officers' suspicion be based upon particularized objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime has been committed." *United States v. Smith*, 648 F.3d 654, 658 (8th Cir. 2011) (internal citations omitted). An "inchoate and unparticularized suspicion or hunch" is insufficient. *Terry*, 392 U.S. at 27 (internal quotation marks omitted). In determining whether the requisite degree of suspicion exists, the court must determine whether the facts collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion—the whole picture, *i.e.*, the "totality of the circumstances" must be taken into account. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *United States v. Jones*, 269 F.3d 919, 927 (8th Cir. 2001). The court may consider any added meaning that certain conduct might suggest to experienced officers in the field, but the officer's reasonable suspicion cannot be "just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent [people].'" *Jones*, 269 F.3d at 927 (quoting *Reid v. Georgia*, 448 U.S. 428, 441 (1980)).

Nettles contends that officers did not have reasonable suspicion to stop him as he was entering his car with his son outside of his home. Before making contact with Nettles, the Florissant Anti-Crime Unit had received an anonymous complaint from a resident about heavy traffic coming and going from Nettles' home at 1 Little Lane. After receiving that information the members of the Anti-Crime Unit, made up of Detective Edwards and three other Florissant police officers conducted surveillance at the house. A few minutes before making contact with

Nettles, Detective Edwards saw a passenger vehicle pull up in front of the house, and Nettles walked out to the vehicle and appeared to conduct a "hand to hand" drug transaction. Nettles went back into the house and came out a few minutes later and placed his toddler son into his truck. It was at that moment that officers approached Nettles, informed him of his *Miranda* rights, and began to question him.

Nettles argues that Detective Edwards' testimony about conducting earlier surveillance at the house was not credible because he could not provide specific information about the dates of the surveillance and he does not have any notes or photos memorializing the surveillance. Detective Edwards did not provide specific information about the prior surveillance at Nettles' home, however, the Court finds his testimony credible that he saw Nettles conduct what he believed to be a drug transaction just minutes before he detained Nettles for questioning. The observation of an apparent drug transaction, coupled with reports of drug dealing led to a reasonable suspicion that Nettle was involved in criminal activity. Therefore, based on the totality of the circumstances, there was reasonable suspicion for officers to conduct an investigative stop of Nettles.

**Consent to search**

The Fourth Amendment prohibits unreasonable searches and seizures and provides that a warrant may not be issued without probable cause, but "the text of the Fourth Amendment does not specify when a search warrant must be obtained." *Kentucky v. King,* 563 U.S. 452, 459 (2011). The ultimate touchstone of the Fourth Amendment is reasonableness. *Michigan v. Fisher,* 558 U.S. 45, 47 (2009) (*per curiam*). "Therefore, although searches and seizures inside a home without a warrant are presumptively unreasonable … that presumption can be overcome." *Id.* (internal citations omitted).

7

"Certain categories of permissible warrantless searches have long been recognized. Consent searches occupy one of these categories.  Consent searches are part of the standard investigatory techniques of law enforcement agencies and are 'a constitutionally permissible and wholly legitimate aspect of effective police activity.'"  *Fernandez v. California*, 571 U.S. 292, 298 (2014) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 231–232, (1973)).  "A consensual search does not violate the Fourth Amendment if the consent was given voluntarily and without coercion."  *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005) (citing *United States v. Martinez,* 168 F.3d 1043, 1046 (8th Cir. 1999)).  "The government must prove voluntary consent by a preponderance of the evidence."  *United States v. Carr*, 895 F.3d 1083, 1088 (8th Cir. 2018).  Whether a defendant consented to a search is a factual matter.  *Id.*

Nettles argues that Hughes' consent in this case was not voluntary.  Four police officers approached Nettles in the driveway of his home.  After being informed of his Miranda rights, officers began to question him.  Nettles told officers that his brother also lived in the home. Officers then walked to the house, entered a garage and Nettles' brother Reno Hughes met them at the door.  Hughes then allowed the officers inside the house.  Detective Edwards then asked Hughes and Nettles for consent to search the house.  Nettles answered, "Go ahead; you're not going to find anything."  Hughes then gave consent, stating "Can I please get my infant child?" The child was asleep in Hughes' bedroom at the time.  Hughes then signed a form entitled "Consent to Search and Seize" [Gov. Exh. 1].  Detective Edwards did not ask Nettles to sign a consent to search form because he believed that the signature of one of the occupants was sufficient.

Courts determine whether consent is voluntary by examining the totality of the circumstances, including relevant factors such as:

(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.  It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011) (quoting *United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010)).

Examining the totality of the circumstances, the Court finds that Hughes' consent to search was constitutionally valid.  Hughes was 21 years old when the search took place.  Officer Edwards smelled marijuana when he entered the house, but Hughes did not appear to be intoxicated.  Hughes was not informed of his *Miranda* rights and Hughes did not have any felony convictions at the time.  Regarding the environment in which consent was obtained, Hughes and Nettles were not under arrest, but likely did not believe they were free to leave, given that four police officers were in their home.  But, they were not detained for long.  There is no indication that officers made promises or misrepresentations.  The consent was given at the home and Hughes verbally consented to the search.  Therefore, in consideration of the above factors, Hughes' consent to search was voluntarily given.

**Authority to search Nettles' bedroom**

Nettles contends that even if Hughes voluntarily consented to the search of the home, he did not have authority to authorize the search of Nettles' bedroom.  Consent is valid "when an

officer reasonably relies on a third party's demonstration of apparent authority" over the premises. *United States v. Amratiel,* 622 F.3d 914, 915 (8th Cir.2010). "Apparent authority exists when 'the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" *Amratiel,* 622 F.3d at 916 (omission in original) (*quoting Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990)). "[S]urrounding circumstances could conceivably be such that a reasonable person would doubt" another's consent "and not act upon it without further inquiry." *United States v. Lindsey*, 702 F.3d 1092, 1096 (8th Cir. 2013) (citing *Rodriguez,* 497 U.S. at 188). "Some circuits have ... require[d] police to go behind appearances to verify third party authority." *Id.* (citing *United States v. Almeida–Perez,* 549 F.3d 1162, 1171 (8th Cir.2008)). "[This] circuit ... has been more liberal about allowing police to form their impressions from context." *Id.*

Here, Officers were aware that both Hughes and Nettles lived in the house which was being rented by their mother. Nettles was present when Hughes signed the consent to search form and he did not object to the house being searched. In fact, Nettles told officers that his room was located down a hallway, stating "You'll see it." There is no evidence that Hughes did not have apparent authority to consent to the search of the premises. In addition, Nettles did not object to the search. The consent of a single occupant is not always sufficient to permit a search of a residence. "[A] physically present co-occupant's stated refusal to permit entry ... render[s] the warrantless search unreasonable and invalid as to him." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006). In the absence of such a refusal, a third party's consent to search is valid "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *United States v. Brewer*, 588 F.3d 1165, 1169 (8th Cir. 2009) (citing *Randolph*, 547 U.S. at 121. Officers have no affirmative duty to

advise a potentially objecting defendant of their intent to search. *Brewer*, 588 F.3d at 1170 (citing *Randolph*, 547 U.S. at 121) ("[T]he potential objector, nearby but not invited to take part in the threshold colloquy, loses out."). Therefore, the officers did not violate Nettles' Fourth Amendment rights by searching his bedroom.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements and Evidence [Doc. 45] should be **DENIED** as set forth above.

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1). Failure to timely file objections may result in a waiver of the right to appeal questions of fact.

NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of December, 2018.